## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO.: 18-CR-131 (RDM)** |
| **JUAN GUILLERMO NARANJO-HENAO,** **also known as "Diego,"** | |
| **Defendant.** | |

## CONSOLIDATED MEMORANDUM IN SUPPORT OF THE GOVERNMENT'S MOTIONS IN LIMINE

MARLON COBAR, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U. S. Department of Justice

Lernik Begian
D. Hunter Smith
Trial Attorneys

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................... 1

**BACKGROUND** ..................................................................................... 1

   A.   The Defendant's Recorded Conversations with a Confidential Source ............................. 1

   B.   The Defendant's Arrest in Ecuador and Subsequent Interview by the DEA ..................... 3

   C.   The Defendant's Arrest in Colombia and Extradition to the United States ....................... 4

**ARGUMENT** ......................................................................................... 4

   I.   THE COURT SHOULD ADMIT THE 2018 RECORDINGS OF THE DEFENDANT ... 5

      A.  SA Novick's Testimony Will Be Sufficient To Authenticate The Recordings ........ 6

      B.  The Recordings Are Admissible Non-Hearsay ........................................................ 9

   II.   THE COURT SHOULD ADMIT ENGLISH TRANSCRIPTS
OF THE RECORDINGS ................................................................................. 11

   III.  THE COURT SHOULD ADMIT EVIDENCE OF THE DEFENDANT'S CONDUCT
AND STATEMENTS FROM BEFORE JANUARY 2018 AND AFTER MARCH 2018 ...... 12

   IV.  THE COURT SHOULD PRECLUDE ANY DEFENSE ARGUMENT OR
SUGGESTION THAT ECUADOR'S CHARGING DECISIONS ARE EXCULPATORY ... 15

   V.   THE COURT SHOULD PRECLUDE ANY DEFENSE ARGUMENT OR
SUGGESTION AS TO THE AFFIRMATIVE DEFENSE OF ENTRAPMENT, UNLESS
THE DEFENSE PROFFERS AN EVIDENTIARY BASIS FOR IT ....................................... 17

   VI.  THE DEFENDANT SHOULD BE ORDERED TO DISCLOSE HIS RULE 16(b)
DISCOVERY AND TRIAL EXHIBITS, INCLUDING THOSE HE MAY ADMIT DURING
CROSS-EXAMINATION OF GOVERNMENT WITNESSES ............................................. 20

# TABLE OF AUTHORITIES

**Cases**

*Heike v. United States,* 227 U.S. 131 (1913) .................................................................. 13

*Lutwak v. United States,* 344 U.S. 604 (1953) ................................................................ 13

*Mathews v. United States*, 485 U.S. 58 (1988) ............................................................... 19

*Peguero v. United States*, 526 U.S. 23 (1999). .............................................................. 18

*Town of Newton v. Rumery*, 480 U.S. 386 (1987) ......................................................... 15

*United States v. Aguilar*, 1:20-cr-390-ENV (July 15, 2024, E.D.N.Y.) ........................... 5

*United States v. Apodaca*, 275 F. Supp. 3d 123 (D.D.C. 2017) ............................... 10, 14

*United States v. Armstrong*, 517 U.S. 456 (1996) ......................................................... 16

*United States v. Baez*, 695 F. Supp. 3d 94 (D.D.C. 2023) ............................................. 19

*United States v. Ben-Shimon*, 249 F.3d 98 (2d Cir. 2001) ............................................. 12

*United States v. Benson*, 957 F.3d 218 (4th Cir. 2020). ................................................ 16

*United States v. Borrero*, No. 13 CR. 58 KBF, 2013 WL 6020773 (S.D.N.Y. Nov. 1, 2013) ..... 16

*United States v. Boykins*, 380 F. (11th Cir. 2010) ........................................................... 9

*United States v. Cano-Flores*, 796 F.3d App'x 930 (D.C. Cir. 2015) ............................. 11

*United States v. Carpenter*, No. CR 21-305 (JEB), 2023 WL 1860978 (D.D.C. Feb. 9, 2023) ... 19

*United States v. Celis*, 608 F.3d 818 (D.C. Cir. 2010) ..................................................... 7

*United States v. Collins*, 715 F.3d 1032 (7th Cir. 2013) .................................................. 7

*United States v. Crocker*, 788 F.2d 802 (1st Cir. 1986) .................................................. 13

*United States v. Crowder*, 141 F.3d 1202 (D.C. Cir. 1998) ............................................ 14

*United States v. Crowder*, 325 F. Supp. 3d 131 (D.D.C. 2018) ...................................... 20

*United States v. Cruz*, 508 F. App'x 890 (11th Cir. 2013) ............................................... 8

*United States v. Cruz*, 765 F.2d 1020 (11th Cir. 1985) .................................................... 12

*United States v. Detelich*, 351 F. App'x 616 (3d Cir. 2009) .......................................... 10

*United States v. Dominguez*, 641 F. App'x 738 (9th Cir. 2016) ....................................... 9

*United States v. Easterday*, No. CR 22-404 (JEB), 2023 WL 6646384, (D.D.C. Oct. 12, 2023) 19

*United States v. Edwards*, 889 F. Supp. 2d 47 (D.D.C. 2012) ........................................ 13

*United States v. Eshetu*, 703 F. Supp. 3d 26 (D.D.C. 2023) ........................................... 18

*United States v. Font-Ramirez*, 944 F.2d 42 (1st Cir. 1991) ......................................... 12

*United States v. Fuentes,* 563 F.2d 527 (2d Cir.1977) .................................................... 7

*United States v. Gadson*, 763 F.3d 1189 (9th Cir. 2014) ................................................ 9

*United States v. Garcia*, No. 18-CR-00466-BLF,

    2021 WL 4594774, (N.D. Cal. Oct. 6, 2021) ......................................................... 16

*United States v. Gewin*, 471 F.3d 201 (D.C. Cir. 2006) ................................................ 10

*United States v. Glover*, 153 F.3d 749 (D.C. Cir. 1998) .......................................... 18, 22

*United States v. Goodwin*, 457 U.S. 368 (1982) ........................................................... 15

*United States v. Hanson*, 339 F.3d 983 (D.C. Cir. 2003). ............................................. 18

*United States v. Hassanshahi*, 195 F. Supp. 3d 35 (D.D.C. 2016) .................................. 6

*United States v. Hemmings*, 482 F. App'x 640 (2d Cir. 2012) ....................................... 7

*United States v. Hill*, No. 12-CR-214 (KAM), 2014 WL 198813, (E.D.N.Y. Jan. 14, 2014) ...... 16

*United States v. Holton*, 116 F.3d 1536 (D.C. Cir. 1997) ............................................. 12

*United States v. Holton*, 122 F. Supp. 2d 21 (D.D.C. 2000) ........................................... 7

*United States v. Hsia*, No. CRIM. 98-0057 (PLF), 2000 WL 195067, (D.D.C. Jan. 21, 2000) ... 20

*United States v. Jones*, 314 F. App'x 883 (7th Cir. 2009) ............................................ 10

*United States v. Jordan*, 810 F.2d 262 (D.C. Cir. 1987) ................................................ 9

*United States v. Khanu*, 664 F. Supp. 2d 80 (D.D.C. 2009) ........................................ 13

*United States v. Knowles*, No. CR 12-266 (RWR),

  2015 WL 10890271, (D.D.C. Dec. 30, 2015) ........................................................ 11

 *United States v. Lorenzana-Cordon*, No. 03CR3311314CKK,

    2016 WL 11664060, (D.D.C. Jan. 21, 2016) .................................................... 11

*United States v. Lyon*, 959 F.2d 701 (8th Cir. 1992) ................................................. 13

*United States v. Mangual-Santiago*, 562 F.3d 411 (1st Cir. 2009).............................. 13

*United States v. Miller*, 895 F.2d 1431 (D.C. Cir. 1990)............................................ 14

*United States v. Mock*, No. CR 21-444 (JEB),

    2023 WL 3844604, at *1 (D.D.C. June 6, 2023) ......................................... 4, 5

*United States v. Napout*, No. 15-CR-252 (PKC),

    2017 WL 6375729, (E.D.N.Y. Dec. 12, 2017) ............................................... 20

*United States v. Nwoye*, 663 F.3d 663 (D.C. Cir. 2011) ............................................ 19

*United States v. Oliveras*, No. CR 21-738 (BAH),

    2023 WL 196525, (D.D.C. Jan. 17, 2023)...................................................... 19

*United States v. Reed*, 641 F.3d 992 (8th Cir. 2011) ................................................. 15

*United States v. Russell*, 411 U.S. 423 (1973) .......................................................... 17

*United States v. Salmon*, 948 F.2d 779 (D.C. Cir. 1991)............................................ 18

*United States v. Sanchez*, 88 F.3d 1243 (D.C. Cir. 1996)........................................... 18

*United States v. Sitzmann*, 856 F. Supp. 2d 55 (D.D.C. 2012) ................................... 13

*United States v. Thomas*, 586 F.2d 123 (9th Cir. 1978)............................................... 8

*United States v. Torres-Correa*, 23 F.4th 129 (1st Cir. 2022)...................................... 6

*United States v. Umoren*, No. 216CR00374APGNJK,

2021 WL 5761771, at *2 (D. Nev. Dec. 3, 2021) ............................................................ 4

*United States v. Vitale*, 549 F.2d 71 (8th Cir. 1977) ...................................................... 8

*United States v. White*, 692 F.3d 235 (2d Cir. 2012) ...................................................... 15

*Wayte v. United States*, 470 U.S. 598 (1985) .................................................................. 15

## Other Authorities

4 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE (4th ed. 2013) ........6

5 JACK B. WEINSTEIN, ET AL., WEINSTEIN'S FEDERAL EVIDENCE (2d ed. 2016) ........................... 6

Black's Law Dictionary 207 (7th ed. 1999) .................................................................. 20

Andrew                    Ingram,          *Conspiracy,*              *Really?,*
110 Iowa L. Rev. 1203 (2025) ................................................................................... 17

## Rules

Fed. R. Evid. 401 .................................................................................................. 15, 16

Fed. R. Evid. 403 .......................................................................................... 15, 16, 17, 19

Fed. R. Evid. 404 .................................................................................................. 14

Fed. R. Evid. 801 ............................................................................................. 9, 10, 11

Fed. R. Evid. 901 .................................................................................................. 6

## PRELIMINARY STATEMENT

The Government respectfully submits this consolidated memorandum of law in support of its motions in limine.

## BACKGROUND

The defendant Juan Guillermo Naranjo-Henao, also known as Diego, is charged with one count of conspiring, in the country of Ecuador and elsewhere, to distribute cocaine for unlawful importation into the United States in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), and 963. The charged conspiracy runs from approximately January 2018 until approximately March 30, 2018. The defendant is a Colombian national who lived in Ecuador during the time of charged conspiracy. He was arrested in Colombia on or around April 10, 2023, and extradited to the United States on or around September 12, 2024.

### A. The Defendant's Recorded Conversations with a Confidential Source

As the evidence at trial will show, in approximately January 2018, the Drug Enforcement Administration ("DEA") began to work with a confidential source ("CS"). Before the DEA had begun to work with the CS, the defendant had already agreed with the CS and others to send, and was actively planning, a shipment of a several hundred kilograms of cocaine from Ecuador to Mexico, which would be ultimately transported into the United States. The defendant and his coconspirators intended to source the cocaine from near the Colombia-Ecuador border.

At the direction of the DEA, the CS began to record his in-person and telephone conversations with the defendant. In these consensually recorded conversations, the defendant and the CS discussed the cocaine shipment, which they then anticipated would consist of 600 kilograms. Thus, in a conversation recorded on or around January 28, 2018, the defendant and the CS discussed whether "600" would fit in an airplane:

| CS: | Hopefully 600 will fit. We don't know that. Until we talk to the pilot, with the airplane and all that, you'll see everything. |
| DEFENDANT: | Yeah. We're going to, if the, if the 600 doesn't fit, then we'll fit 500, we'll take some out, Ivan will go anyway and that's it, and we'll try.[1] |

As the recordings and other evidence at trial will make clear, the airplane was intended to transport the cocaine to Mexico. In the same conversation, the defendant and the CS also discussed plans to import the cocaine from Mexico into the United States:

| CS: | How many days does it take to get there? I don't, I don't... |
| DEFENDANT: | Ten days. |
| CS: | Ten days? |
| DEFENDANT: | Ten days to get here. |
| CS: | Here? |
| DEFENDANT: | To San Diego, Tijuana. To get to Tijuana and Los Angeles, ten days. |
| CS: | Is it a, is it the border or what? |
| DEFENDANT: | Tijuana is a border. It's an hour and a half from Tijuana to Los Angeles. And they can handle 200 kilos daily, the truck. |
| CS: | Two hundred daily? |
| DEFENDANT: | Daily, that they take up to the border. From there they take it through a tunnel and it arrives. |

In other conversations, the defendant also discussed using one or more boats (known as "lanchas") instead of an airplane for transporting the cocaine and he also discussed using other countries, such as Belize, as transshipment points. The weight of the contemplated shipment also fluctuated depending on their intended method of transportation and their ability to source cocaine. Another individual (Christian Said Castorena de Leon, aka "Chiquitin") also participated in some of the recorded conversations with the CS and the defendant regarding the planned shipment. The

---

[1] The original conversation was in Spanish. All translations provided in this memorandum are draft translations and subject to revision.

defendant also sent voice memoranda (similar to voicemails) to the CS discussing cocaine trafficking activities, which the CS later provided to the DEA.

### B. The Defendant's Arrest in Ecuador and Subsequent Interview by the DEA

On or around March 30, 2018, Ecuadorian authorities arrested the defendant, Chiquitin and one other Mexican national in two apartments in the same building in Guayaquil, Ecuador.  The arrest was the result of an independent Ecuadorian investigation and not at the request of the United States.  At the time of the arrest, Ecuadorian police seized approximately 59 kilograms of cocaine and 12 kilograms of marijuana.  As a result of the arrest, the defendant and his conspirators never completed the larger shipment of cocaine that they had been planning.  The defendant, however, continued to communicate with the CS while in custody through calls and voice memoranda, recordings of which the CS preserved and provided to the DEA.  Ecuadorian authorities appear not to have pursued charges against the defendant and eventually released him from custody.

On or around May 21 and 22, 2019, after the defendant had been released from Ecuadorian custody, he agreed to be interviewed by several DEA agents, including DEA Special Agent ("SA") Kevin Novick, in a hotel in Quito, Ecuador.  Before the interview commenced, the DEA agents informed the defendant that he had been indicted in this case.  The defendant signed a document acknowledging that he understood that (1) he had the right to remain silent; (2) anything he said could be used against him in a court of law; (3) he had the right to an attorney both before and while answering any questions; and (4) if he could not afford an attorney, one could be provided to him.

During the ensuing interview, the defendant first denied guilt on the ground that he had not personally transported cocaine to Mexico or the United States.  One of the interviewing DEA

agents explained U.S. conspiracy law to the defendant. The defendant then acknowledged that he had been part of a conspiracy to transport drugs since approximately 2017.

Specifically, the defendant described having met with the CS and others, including an individual based in Mexico ("Individual-1"),[2] several times in both Ecuador and Mexico starting in at least 2017 to discuss shipping cocaine from Ecuador to Mexico by either boat or airplane. The defendant described Individual-1 as having connections that enabled him to transport narcotics into the United States. The defendant described Chiquitin's participation in the planned cocaine shipment as well as the obstacles that the deal faced, including, among other things, problems with funding. He also described his own arrest in Ecuador and stated that the cocaine that was seized at the time of the arrest was destined for Mexico.

### C. The Defendant's Arrest in Colombia and Extradition to the United States

After his release from Ecuadorian custody, the defendant was arrested again in Colombia on or around April 10, 2023, this time in connection with the indictment in this case. On or around April 11, 2023, several DEA employees, including Special Agent Novick, met with the defendant, but the defendant stated that he did not want to answer questions without an attorney present. The interviewed therefore ended.

The defendant was extradited to the United States on or around September 12, 2024.

### ARGUMENT

Motions in limine "are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *United States v. Mock*, No. CR 21-444 (JEB), 2023 WL 3844604, at *1 (D.D.C. June 6, 2023) (quotation marks omitted); *cf. United States v. Umoren*, No. 216CR00374APGNJK, 2021 WL 5761771, at *2 (D. Nev. Dec. 3, 2021) ("Motions *in limine* allow

---

[2] The Government is aware of Individual-1's name but has not included it in this public filing.

[a trial judge] to resolve issues prior to trial, thus saving jurors' time and eliminating distractions."). "The court has broad discretion in rendering evidentiary rulings, which extends to the threshold question of whether a motion *in limine* presents an evidentiary issue that is appropriate for ruling in advance of trial." *Mock*, 2023 WL 3844604, at *1 (cleaned up); *cf. Barnes v. D.C.*, 924 F. Supp. 2d 74, 79 (D.D.C. 2013) (noting that "in some instances it is best to defer rulings until trial") (quotation marks omitted).

Several of the Government's motions *in limine* concern testimony and documents that the Government will seek to elicit or admit at trial. Though the Government is not currently seeking to admit any specific piece of evidence, it provides this memorandum of law to set forth the relevant principles of law that will support such admission at the appropriate time. The Court may therefore choose to treat some or all the Government's motions as request for a ruling on "the Court's legal parameters for assessing a [motion to admit evidence] if and when one is made." *United States v. Aguilar*, 1:20-cr-390-ENV (July 15, 2024, E.D.N.Y.), ECF No. 362 (construing a pretrial motion *in limine* as such).

## I.    THE COURT SHOULD ADMIT THE 2018 RECORDINGS OF THE DEFENDANT

At trial, the Government will move to admit several recordings of in-person meetings and telephone conversations between the defendant and the CS from 2018. In addition, the defendant sent the CS several voice memoranda, which the Government may also move to admit. The Government will authenticate the recordings through the testimony of Special Agent Kevin Novick. Because the statements in the recordings are highly relevant and are not hearsay, the Court should admit the statements after they are so authenticated.

**A.    SA Novick's Testimony Will Be Sufficient To Authenticate The Recordings**

To authenticate evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  "The threshold for the Court's determination of authenticity is not high, however and the proponent's burden of proof for authentication is slight." *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (quotation marks omitted).  "The court 'must admit the evidence if sufficient proof has been introduced to support a finding that the fact does exist,' and 'in spite of any issues the opponent has raised about flaws in the authentication (which only go to the weight of the evidence instead of its admissibility).'" *Id.* (quoting 5 Jack B. Weinstein, et al., Weinstein's Federal Evidence § 901.02[3], at 901-13, 901-15 (2d ed. 2016)).  "The ultimate resolution of the evidence's authenticity is reserved for the jury." *Id.*  Thus, "'[a] party who denies making a statement cannot keep it out . . . if the proponent presents sufficient proof to support a jury finding that the objecting party made the statement.'" *Id.* (quoting 4 Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8:44, at 389 (4th ed. 2013)).

Federal Rule of Evidence 901(b) lists several non-exhaustive "examples" of evidence that can authenticate other evidence.  "The examples are not intended as an exclusive enumeration of allowable methods[.]"  Fed. R. Evid. 901, advisory committee note.  Nonetheless, each example describes a method of authentication that is independently "sufficient."  *United States v. Torres-Correa*, 23 F.4th 129, 133 (1st Cir. 2022).  Here, SA Novick's testimony corresponds with several of the listed examples and therefore authenticates the recordings several times over.

*First*, SA Novick can testify that he and other DEA agents directed the CS to record his conversations with the defendant, that the CS agreed, and that the CS then provided the DEA with these recordings shortly after they were made.  This "[t]estimony that an item is what it is claimed

to be" is sufficient for authentication.  Fed. R. Evid. 901(b)(1).  As courts have held, a government agent's testimony about "instructions to [a confidential source] regarding when and how to record his conversations with 'drug suppliers and drug customers' and to deliver the tapes to the government" is sufficient to authenticate the recordings.  *United States v. Collins*, 715 F.3d 1032, 1035 (7th Cir. 2013).  "There is no requirement that the tapes be put in evidence through the person wearing the recorder, or for that matter, through a contemporaneous witness to the recorded conversations."  *United States v. Fuentes,* 563 F.2d 527, 532 (2d Cir.1977); *cf. Collins*, 715 F.3d at 1036 ("[I]t would be an impossible standard to always require agents to be present when a tape recording is made, especially in foreign countries.").  Nor does the Government need to "show the identity of each person who had custody of the tapes."  *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010); *cf. United States v. Holton*, 122 F. Supp. 2d 21, 27 (D.D.C. 2000) ("The possibility of adulteration need not be eliminated absolutely.").  Moreover, even if the foregoing were not sufficient, SA Novick can also testify that he was present when the CS placed at least one recorded call to the defendant and that the CS later provided the same recording to him and that it fairly and accurately captured the actual conversation.

*Second*, SA Novick can identify both the defendant's and the CS's voices on the recordings because SA Novick heard those "voice[s] . . . under circumstances that connect [them] with the alleged speaker[s]."  Fed. R. Evid. 901(b)(5); *see, e.g.*, *United States v. Hemmings*, 482 F. App'x 640, 643 (2d Cir. 2012) (holding that "tapes were authenticated by a government agent who recognized the voices on the tapes").  SA Novick can recognize the CS's voice because they had extensive, at times daily, contact for several months.  SA Novick can identify the defendant's voice because, as described above, they spoke in person on two separate occasions: once in Ecuador in 2019 (for two days) and once in Colombia in 2023.  *See White*, 116 F.3d at 921 (finding agent's

voice identification based on a 45-minute post-arrest interview sufficient for authentication); *United States v. Vitale*, 549 F.2d 71, 73 (8th Cir. 1977) (finding agent's testimony "that he had spoken with [defendant] personally on two occasions and could identify her voice" to satisfy Fed. R. Evid. 901(b)(5)); *cf. United States v. Cruz*, 508 F. App'x 890, 898 (11th Cir. 2013) ("[T]he identifying witness does not need to be an expert witness."). What is more, SA Novick's expected testimony that he heard the defendant's voice over the phone when the CS placed a call in SA Novick's presence further corroborates the authentication. *See also United States v. Thomas*, 586 F.2d 123, 133 (9th Cir. 1978) (holding that agent's testimony that he "conversed with [the defendant] over the telephone" satisfied Fed. R. Evid. 901(b)(5)).

*Third*, the "contents [and] distinctive characteristics of the [recordings], taken together with all the circumstances" provide yet another independent basis for authentication. Fed. R. Evid. 901(b)(4). Specifically, SA Novick can testify that several of the recorded conversations match up with admissions that the defendant made during the 2019 interview. For instance, in his May 2019 interview, the defendant admitted that in or around February 2018, he worked with the CS and a person named "Christian" to move a load of about 500 to 600 kilograms of cocaine from Ecuador to Mexico using containers or boats. In the recordings, the defendant and "Christian" (who is also identified on one of the recordings as "Chiquitin"), discuss moving cocaine loads from Ecuador to Mexico in or around February 2018. In his May 2019 interview, the defendant also admitted that he worked with a cocaine supplier named "Ivan" from "San Lorenzo" and a potential cocaine buyer with the same first name as Individual-1 from Guadalajara, Mexico. The 2018 recordings again capture the defendant discussing "Ivan," San Lorenzo, Individual-1, and drug loads destined for Mexico. Moreover, in several of the voice memoranda that the defendant sent to the CS, the defendant mentioned being in "jail." At trial, the Government will present

evidence that the defendant was arrested in Guayaquil, Ecuador, on or around March 30, 2018, and held in custody for some time thereafter.  These and several other similar overlaps between Defendant's 2019 admissions and the content of the 2018 recordings are yet a further basis to authenticate the recordings.  *United States v. Gadson*, 763 F.3d 1189, 1204 (9th Cir. 2014) (noting "context clues" and "information accessible to only a handful of people" as factors for authentication).

For the foregoing reasons, there is ample evidence "to support a finding" that the recordings are recordings of the defendant and others from 2018.  Fed. R. Evid. 901(a).

### B.    The Recordings Are Admissible Non-Hearsay

The recordings are not hearsay for several different reasons.

*First*, the defendant's statements captured in the recordings at issue are admissible as party opponent statements under Fed. R. Evid. 801(d)(2)(A).  *See United States v. Jordan*, 810 F.2d 262, 264 (D.C. Cir. 1987) ("Appellant's own incriminating statements were, of course, party admissions, and therefore not hearsay.").

*Second*, the statements of the CS are not hearsay because the Government will admit them only to provide context necessary for jurors' understanding of the defendant's statements, not for the truth of any matters asserted.  *See* Fed. R. Evid. 801(c)(2); *see Jordan*, 810 F.2d at 264 (noting informant's statements and questions in recordings with defendant "were not hearsay" and "were admitted not for their truth," but "to make [defendant's] responses intelligible to the jury and recognizable as admissions" (citation omitted)); *United States v. Dominguez*, 641 F. App'x 738, 741 (9th Cir. 2016) (holding cooperating witness's statements in recordings were admissible "to provide context for [defendant's] statements"); *United States v. Boykins*, 380 F. App'x 930, 934 (11th Cir. 2010) (holding that informant's statements were properly admitted for context and not

for the truth of the matter); *United States v. Detelich*, 351 F. App'x 616, 623 (3d Cir. 2009) (same);

*United States v. Jones*, 314 F. App'x 883, 886-87 (7th Cir. 2009) (same).[3]

 *Third*, the statements of third parties (i.e., neither the defendant nor the CS) are statements

of coconspirators in furtherance of the conspiracy, as the Government will show at trial.  *See* Fed.

R. Evid. 801(d)(2)(E) (statements made by "the party's coconspirator during and in furtherance of

the conspiracy" are not hearsay).[4]  To admit coconspirator statements, "the district court must find

by a preponderance of the evidence that a conspiracy existed and that the defendant and declarant

were members of that conspiracy." *United States v. Apodaca*, 275 F. Supp. 3d 123, 137 (D.D.C.

2017) (citing *United States v. Gewin*, 471 F.3d 197, 201 (D.C. Cir. 2006)).  "[I]t is common

practice for courts in the D.C. Circuit to admit co-conspirator statements conditionally, 'subject to

connection through proof of conspiracy'—*i.e.*, contingent upon the Government's subsequent

---

[3] Moreover, in many instances, the relevant portions of the CS's speech are not statements at all, but questions or directions.  For instance, the CS's speech in the following exchange with defendant on January 28, 2018, consists of questions, and not statements, and is necessary to provide context for the defendants' statements in any event:

| | |
|---|---|
| Defendant: | We have a problem . . . Look Ivan got into trouble . . . They put a bomb in San Lorenzo . . . We worked for Juancho, huh? Juancho is a dissident of the FARC . . . And this dude has put a bomb in the police headquarters of San Lorenzo. . . The United States got involved to investigate.  All . . . Colombia is investigating, the DEA. . . . It's like that in San Lorenzo. It's really crowded, crowded, crowded with cops, DEA, CIA, everything . . . |
| CS: | What are we going to do right now with this? |
| Defendant: | No, I already told Ivan, "Hey, what's up with that?" He said, "No everything is still on, everything's still on, we just have to be more careful." You know they're not afraid of anyone but we are. You get me? We have to be very . . . very . . . very … careful with them over there. … |
| CS: | . . . Did  the . . . the Mexicans tell you they want to put someone over there? How does that work? |
| Defendant: | Of course.  They're waiting . . . the Mexicans are waiting for … the pilot to arrive on Tuesday. |

[4] The primary third party captured on the recordings is Chiquitin.

introduction at trial of sufficient evidence to persuade the Court that the requirements of Rule 801(d)(2)(E) have been met." *United States v. Lorenzana-Cordon*, No. 03CR3311314CKK, 2016 WL 11664060, at *1 (D.D.C. Jan. 21, 2016); *see United States v. Knowles*, No. CR 12-266 (RWR), 2015 WL 10890271, at *2 (D.D.C. Dec. 30, 2015) (calling this "[s]tandard practice in this district"); *Gewin*, 471 F.3d at 201 (approving this practice). Further, even if the statements of third parties were not statements of coconspirators, they would still not be hearsay because the government would not be admitting them "to prove the truth of the matter asserted," Fed. R. Evid. 801(c)(2), but (like the CS's statements) to provide context for the defendant's own statements.

## II.   THE COURT SHOULD ADMIT ENGLISH TRANSCRIPTS OF THE RECORDINGS

At trial, the Government will also move to admit English transcripts of portions of the recordings. The Government expects that the parties will stipulate to the accuracy of the translations, but if they do not, the Government will produce a certified translator to testify to the accuracy of the translations. Either way, the Court should admit the English transcripts as substantive evidence here, as is the common practice in cases involving foreign-language recordings.

The D.C. Circuit has held that English translations of foreign language communications are admissible as substantive evidence because they aid the jury in understanding and evaluating the evidence. *United States v. Cano-Flores*, 796 F.3d 83, 88-89 (D.C. Cir. 2015). In *Cano-Flores*, the trial court admitted into evidence English transcripts of recordings in a foreign language and instructed the jury to evaluate the transcripts "just like any other evidence in [the] case." *Id.* at 88. The D.C. Circuit affirmed the admission of those transcripts, noting "the recordings were in a foreign language and the jurors could only understand the evidence through the translated transcripts." *Id.* at 89. The Court added, "we agree with other circuits that when the tapes are in

11

a foreign language, it generally makes little sense to say that accurate transcriptions do not qualify as evidence." *Id.*; *see also United States v. Font-Ramirez*, 944 F.2d 42, 48-49 (1st Cir. 1991) (affirming decision to admit transcripts); *United States v. Ben-Shimon*, 249 F.3d 98, 100-01 (2d Cir. 2001) (same); *United States v. Cruz*, 765 F.2d 1020, 1024 (11th Cir. 1985) (same). Therefore, the Court should admit the transcripts as substantive evidence because "the jurors could only understand the evidence through the translated transcripts." *Cano-Flores*, 796 F.3d at 89; *see also United States v. Holton*, 116 F.3d 1536, 1542 (D.C. Cir. 1997) ("[W]e believe that it is the better practice to require formal admission [of transcripts] into evidence during the trial.").

## III. THE COURT SHOULD ADMIT EVIDENCE OF THE DEFENDANT'S CONDUCT AND STATEMENTS FROM BEFORE JANUARY 2018 AND AFTER MARCH 2018

The indictment charges a conspiracy "[b]eginning in or around January 2018 and continuing thereafter, up to in or around March 30, 2018." Indictment. At trial, the Government will admit evidence concerning the defendant's actions and statements from both before January 2018 and after March 2018. Specifically, the Government anticipates that it will elicit, among other things, testimony about the defendant's statements to the DEA at the May 2019 interview in Quito, in which the defendant described his and his coconspirators' planning in 2017 for the cocaine shipment to Mexico and the United States, including meetings and discussions with the CS and Individual-1. The Government also anticipates that it will introduce some the defendant's voice memoranda from when he was in Ecuadorian custody, including from April and May 2018, in which he continued to speak to the CS about the planned cocaine shipment. This evidence is admissible even though it pre- or post-dates the approximate dates alleged in the indictment for several different reasons,

*First*, "[i]t is well established that approximate dates in an indictment are not controlling."

*United States v. Crocker*, 788 F.2d 802, 805–06 (1st Cir. 1986); *United States v. Lyon*, 959 F.2d 701, 705 (8th Cir. 1992) (same).  Thus, "in establishing the existence of a conspiracy, the government is not bound by approximate start or end-dates listed in the indictment; the scope of the conspiracy may extend beyond an approximate date." *United States v. Mangual-Santiago*, 562 F.3d 411, 428 (1st Cir. 2009).  After all, events that occurred a few weeks or months before January 2018 or after March 2018 did occur between "*around* January 2018" and "*around* March 30, 2018" (emphases added), the period charged in the indictment.

Second, even if the approximate dates in the indictment were controlling, "acts and directions of earlier date tend[] to show that the same conspiracy was on foot" during the charged period.  *Heike v. United States*, 227 U.S. 131, 145 (1913).  In other words, "[s]ome bad acts can be so close in time and place as to be a part of the charged crime.  And this may be particularly so in conspiracy cases, which involve an ongoing course of conduct rather than a single act." *United States v. Sitzmann*, 856 F. Supp. 2d 55, 59 (D.D.C. 2012); *United States v. Khanu*, 664 F. Supp. 2d 80, 83 (D.D.C. 2009) ("[W]here the crime charged is conspiracy, evidence closely related to the conspiracy alleged in the indictment is admissible as intrinsic evidence.").  Thus, courts in this Circuit have admitted "conversations the defendant had with his soon-to-be co-conspirators" as intrinsic evidence of the charged conspiracy, even though the conspiracy had not actually started. *United States v. Edwards*, 889 F. Supp. 2d 47, 50 (D.D.C. 2012) (discussing *United States v. Sitzmann,* 856 F.Supp.2d 55 (D.D.C.2012)).  Here, the conspiracy *had* started by 2017—as the defendant himself described in his subsequent interview with the DEA; thus, evidence concerning the defendant's activities during that period is admissible as evidence that the conspiracy continued throughout the period charged in the indictment.

Likewise, even if the charged conspiracy ended exactly on March 30, 2018 (the

approximate end date charged in the indictment), "[i]t does not necessarily follow that acts and declarations made after the conspiracy ended are not admissible." *Lutwak v. United States*, 344 U.S. 604, 617 (1953); *cf. United States v. Apodaca*, 275 F. Supp. 3d 123, 134 (D.D.C. 2017) ("[T]he mere fact that a defendant is arrested does not, without more, demonstrate withdrawal from a conspiracy."). Instead, the recordings from April and May 2018 are direct evidence that the conspiracy existed during the period charged. For example, in a series of voice memoranda to the CS on or around April 5 and 6, 2018—about a week after his arrest in Ecuador—the defendant warned the CS about Chiquitin "messing things up" and instructed the CS to call another coconspirator to "take Chiquitin out of the middle." Similarly, in a voice message to the CS on or around April 13, 2018, the defendant asked the CS to dispose of a phone that the defendant believed contained incriminating information. These calls are direct evidence of an ongoing conspiracy from which a jury could reasonably and properly infer that the conspiracy existed during the charged period, only a few weeks earlier.[5]

*Third*, even if the defendant's statements regarding the conspiracy in 2017 and his recordings from April and May 2018 were not intrinsic evidence, the Court could admit them for any non-propensity purpose under Rule 404(b). *See United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990) ("[U]nder Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character." (emphases in original)); *see also United States v.* Crowder, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc) (noting that Rule 404(b) "is quite permissive"). Here, the defendant's actions to plan a shipment of cocaine from Ecuador to Mexico (and eventually to the United States) in 2017 as well his

---

[5] Moreover, a subsequent recording may contain admissions that the conspiracy existed during the charged period. For example, in a recording from May 6, 2018, Defendant stated that he was in jail because of the deal he and the CS had been working on "since November [2017]."

statements to coconspirators shortly after his arrest from April and May 2018 show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, [and] lack of accident." Fed. R. Evid. 404(b). For this and the other reasons stated above, the evidence is admissible.

## IV. THE COURT SHOULD PRECLUDE ANY DEFENSE ARGUMENT OR SUGGESTION THAT ECUADOR'S CHARGING DECISIONS ARE EXCULPATORY

The defense has repeatedly suggested that it is somehow relevant that Ecuadorian prosecutors apparently dropped charges against the defendant after arresting him in March 2018. *E.g.* ECF No. 16 at 1; ECF No. 21 at 3. The Court should preclude any argument or suggestion to the jury that the Government of Ecuador's charging decisions are exculpatory as to the charges in this case.

"Several circuits have unanimously upheld the exclusion of evidence of prior [federal] charging decisions on the ground that many factors unrelated to guilt may influence those decisions and their admission therefore risks misleading the jury and confusing the issues." *United States v. Reed*, 641 F.3d 992, 993 (8th Cir. 2011); *see id.* (citing decisions of First, Seventh, Ninth and Eleventh Circuits); *cf. United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (suggesting such evidence may be precluded after a case-specific analysis of relevance and prejudice). After all, "the Government retains 'broad discretion' as to whom to prosecute," *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982)), and charging decisions are "rarely simple" and implicate complex considerations, including the strength and importance of a case, the government's enforcement priorities, and the allocation of resources, *Town of Newton v. Rumery*, 480 U.S. 386, 396 (1987).

For these reasons, even the federal government's decisions to pursue or decline other

charges have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401(B). Even if such decisions had some probative value, it would be far outweighed by the time that would be needed to explain to jurors the factors that go into charging decisions and the prejudice and confusion that would result. *See* Fed. R. Evid. 403; *United States v. Borrero*, No. 13 CR. 58 KBF, 2013 WL 6020773, at *2 (S.D.N.Y. Nov. 1, 2013) (precluding evidence of charging decisions under Rule 403). Indeed, asking a jury to evaluate such issues may even raise "separation of powers concerns." *United States v. Garcia*, No. 18-CR-00466-BLF, 2021 WL 4594774, at *3 (N.D. Cal. Oct. 6, 2021) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

Just as *federal* charging decisions are not a proper subject for juror consideration, the charging decisions of other sovereigns—as to different crimes with different elements—are an even less appropriate one. As the Fourth Circuit has explained, "a state's decision to drop charges may have nothing at all to do with guilt or innocence, particularly in relation to a federal crime with distinct elements." *United States v. Benson*, 957 F.3d 218, 236 (4th Cir. 2020). Such "non-prosecution decisions are irrelevant because they often take into consideration the availability of prosecutorial resources, alternative priorities, the expectation of prosecution by other authorities, or any number of other valid discretionary reasons." *Id.* at 236-37 (quotation marks omitted); *see also United States v. Hill*, No. 12-CR-214 (KAM), 2014 WL 198813, at *1-2 (E.D.N.Y. Jan. 14, 2014), *aff'd,* 658 F. App'x 600 (2d Cir. 2016) (excluding evidence under Fed. R. Evid. 403 of state prosecutor's decision not to charge defendant).

Here, the decision by the Government of Ecuador to pursue, or not pursue, charges under its law, and using the evidence in its possession, is completely irrelevant to whether the defendant

committed the federal offense charged in the indictment. *See* Fed. R. Evid. 401. Even if it had some probative value, it would be vastly outweighed by the waste of time and inevitable juror confusion that would result if the parties were required to explain to the jurors the differences between the standards of proof and elements in Ecuador[6] as well as take a needless excursion into the evidence in the possession of Ecuadorian prosecutors, their enforcement priorities, and decisions as to allocation of resources. *See* Fed. R. Evid. 403.

Here, the Government has no objection to the jury learning that Ecuadorian authorities did not pursue charges after the defendant's arrest and that they released the defendant from custody because those facts are part of the narrative of the case and, in particular, the circumstances around the DEA's 2019 interview of the defendant in Quito. But the defense should be precluded from arguing or suggesting to the jury that the decision by Ecuadorian authorities not to pursue charges is somehow exculpatory or otherwise material to whether the defendant is guilty of the federal offense on which he is now being tried.

## V.    THE COURT SHOULD PRECLUDE ANY DEFENSE ARGUMENT OR SUGGESTION AS TO THE AFFIRMATIVE DEFENSE OF ENTRAPMENT, UNLESS THE DEFENSE PROFFERS AN EVIDENTIARY BASIS FOR IT

After he was extradited to the United States, the defendant suggested that he believed he was entrapped by the Government. Because there is no evidentiary basis for the defense of entrapment, any defense argument or suggestion of such a defense is likely to confuse the jury and should be precluded under Federal Rule of Evidence 403. Alternatively, the Court should warn the defense that it may not argue entrapment at closing unless it establishes an evidentiary basis

---

[6] Among other things, the defendant is charged in this case with one count of conspiracy, but many foreign countries do not have a crime matching the elements of conspiracy under U.S. law. *Cf.* Andrew Ingram, *Conspiracy, Really?*, 110 Iowa L. Rev. 1203, 1213 (2025) (observing that what "we know as conspiracy is unknown in civil law countries").

for that defense at trial.

Entrapment is a "relatively limited defense." *United States v. Russell*, 411 U.S. 423, 435 (1973). It requires the defendant to show "government inducement of the crime." *United States v. Eshetu*, 703 F. Supp. 3d 26, 36 (D.D.C. 2023) (quoting *United States v. Glover*, 153 F.3d 749, 754 (D.C. Cir. 1998)). "Inducement is government behavior that would cause[ ] an unpredisposed person to commit a crime." *United States v. Salmon*, 948 F.2d 776, 779 (D.C. Cir. 1991) (quotation marks omitted). "Inducement involves persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy or friendship." *United States v. Sanchez*, 88 F.3d 1243, 1249 (D.C. Cir. 1996) (quotation marks omitted), *abrogated on other grounds by Peguero v. United States*, 526 U.S. 23 (1999). "A solicitation, request or approach by law enforcement officials to engage in criminal activity, standing alone, is not an inducement." *Id.* (quotation marks omitted). Instead, "the government's behavior [must be] such that a law-abiding citizen's will to obey the law could have been overborne." *Id.* (quotation marks omitted). If the defendant carries his burden of showing inducement, "the burden then shifts to the government to prove the defendant was predisposed to commit the crime." *United States v. Hanson*, 339 F.3d 983, 988 (D.C. Cir. 2003).

Here, there is no possibility that the defendant can carry his burden of showing that he was induced to commit the charged crime. In fact, as described above (and as the evidence at trial will show), the defendant had already conspired to transport several hundred kilograms of cocaine to the United States with the CS and others in 2017 *before* the CS became a source for the Government in or around January 2018. Thus, the crime had already begun before there was any arguable "government behavior" at all. *Glover*, 153 F.3d at 754. Even putting that aside, and even if the CS's conduct were attributable to the Government, there was still no conduct that could

18

"cause[] an unpredisposed person to commit a crime," *Salmon*, 948 F.2d at 779, or otherwise cause "a law-abiding citizen's will to obey the law [to be] overborne," *Glover*, 153 F.3d at 754.

Because there is no evidentiary basis for the defense of entrapment, the jury should not be instructed on it nor should the defense be permitted to argue it to the jury.  "[A] defendant is only entitled to a jury instruction on an affirmative defense if there is sufficient evidence from which a reasonable jury could find for the defendant on that theory."  *United States v. Carpenter*, No. CR 21-305 (JEB), 2023 WL 1860978, at *1 (D.D.C. Feb. 9, 2023) (quotation marks omitted); *United States v. Nwoye*, 663 F.3d 460, 462 (D.C. Cir. 2011); *cf. Mathews v. United States*, 485 U.S. 58, 59 (1988) (entrapment is an "affirmative defense").

Because the defense will not be entitled to an instruction on an entrapment defense, any argument or suggestion of such a defense to the jury will waste time and be more prejudicial than probative.  *See* Fed. R. Evid. 403; *Carpenter*, 2023 WL 1860978, at *1 (noting a court may "exclude evidence whose probative value is outweighed by other negative factors, such as its potential to confuse or mislead the jury").  The Court should therefore preclude under Rule 403 any argument or suggestion to the jury of an entrapment defense.  *See, e.g.*, *United States v. Baez*, 695 F. Supp. 3d 94, 108 (D.D.C. 2023) (precluding argument as to an affirmative defense where the defense has not "proffered any evidence" in support); *United States v. Oliveras*, No. CR 21-738 (BAH), 2023 WL 196525, at *2 (D.D.C. Jan. 17, 2023) (same).  In the alternative, the Court should warn the defense that it will "disallow a closing argument to this effect unless [the defense] presents sufficient evidence from which a reasonable factfinder could find for the defendant on that theory."  *United States v. Easterday*, No. CR 22-404 (JEB), 2023 WL 6646384, at *3 (D.D.C. Oct. 12, 2023) (cleaned up).

## VI.    THE DEFENDANT SHOULD BE ORDERED TO DISCLOSE HIS RULE 16(b) DISCOVERY AND TRIAL EXHIBITS, INCLUDING THOSE HE MAY ADMIT DURING CROSS-EXAMINATION OF GOVERNMENT WITNESSES

If the defendant requests and the Government provides Rule 16 discovery, a defendant must likewise provide the Government with documents and other items that the defendant "intends to use . . . in the defendant's case-in-chief at trial." Fed. R. Crim. P. 16(b)(1)(A). Here, the defendant has requested Rule 16 discovery from the Government, and the Government has complied. Thus, the defendant must provide the Government with documents and other items that the defendant "intends to use . . . in the defendant's case-in-chief at trial." *Id.* "Under the plain language of the Rule, defendant is required to turn over all such documents, regardless of their source or the means by which she came to possess them." *United States v. Hsia*, No. CRIM. 98-0057 (PLF), 2000 WL 195067, at *1 (D.D.C. Jan. 21, 2000).

The documents that the defense must identify and produce in advance of trial include those it may admit for substantive purposes while cross-examining government witnesses. As this district court has explained:

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Black's Law Dictionary 207 (7th ed. 1999). Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

*Id.* at *2. "Nearly every court to consider the issue has concluded the same." *United States v. Crowder*, 325 F. Supp. 3d 131, 136 (D.D.C. 2018). Thus, "Rule 16 requires [d]efendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether [or not] the exhibits will be introduced through a government witness." *United States v. Napout*, No. 15-CR-252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017). If the defense does not do

so, the Court may preclude the defense from introducing such evidence. *See id.* at *8; *Hsia*, 2000 WL 195067, at *2.

Accordingly, the Court should order the defense to identify and produce all documents it intends to introduce for substantive purposes at trial on or before September 8, 2025, the date on which the parties' exhibit lists are due.

Respectfully Submitted,

MARLON COBAR, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U. S. Department of Justice

By:    __/s/ D. Hunter Smith__
Lernik Begian
D. Hunter Smith
Trial Attorneys
Narcotic and Dangerous Drug
Section Criminal Division
U.S. Department of Justice
145 N Street, NE
East Wing, Second Floor
Washington, D.C. 20530
202-540-0917

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via the CM/ECF system, to counsel of record for the defendant, this 11th day of August 2025.

*/s/ D. Hunter Smith*
D. Hunter Smith
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
