**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO.: 18-CR-131 (RDM)** |
| **JUAN GUILLERMO NARANJO-HENAO,** **also known as "Diego,"** | |
| **Defendant.** | |

### GOVERNMENT'S RESPONSE TO DEFENDANT'S SIX MOTIONS

The United States of America, by and through the undersigned counsel, submits this opposition to Defendant Juan Guillermo Naranjo-Henao's six motions, namely: (1) Motion for Pre-Trial Determination of Admissibility of Defendant's Interviews with Law Enforcement (ECF No. 58); (2) Motion *in Limine* to Exclude Government's Drug Expert Testimony (ECF No. 59); (3) Motion for Pre-Trial Determination of Admissibility of Conversations Recorded by a Non-Testifying Informant (ECF No. 60); (4) Motion to Compel (ECF No. 61); (5) Motion to Strike Improper Alias (ECF No. 62); and (6) Motion to Quash Results of Improper Subpoena and Fruits of the Poisonous Tree (ECF No. 63). Each motion, discussed in turn, should be either denied on its merits or denied as moot.

### A. The Court Should Deny Defendant's Request for Pre-Trial Determination of Admissibility of His Statements (ECF No. 58).

The Defendant asks this Court to determine at a pretrial hearing whether voluntary statements he made during a two-day interview with law enforcement are admissible. But the Court does not need a hearing to deny his motion because his arguments go to the weight of the evidence, not its admissibility, and he has not presented any specific, nonconjectural facts to warrant a hearing.

*a. Relevant Background*

On May 21 and 22, 2019, approximately one year after his indictment in this case, the Defendant voluntarily met with Drug Enforcement Administration ("DEA") agents in Ecuador and discussed his and his coconspirators' illicit activities. Two of the DEA agents—Special Agent ("SA") Kevin Novick, who led the interview, and SA Chris Johnson, who also participated— conducted that interview in Spanish. SA Novick and SA Johnson translated the Defendant's statements into English during the interview, including for notetaking purposes. SAs Novick and Johnson will testify that they both were sufficiently proficient in Spanish to conduct the interview and translate the Defendant's statements into English. The agents will also testify that throughout the interview, they clarified any questions they had—at times repeating the Defendant's statements back to him—to confirm their understanding and ensure accurate notetaking.

During those two days, the Defendant made statements about his role in the charged conspiracy. He also told the DEA agents about his co-conspirators and other drug traffickers in an effort to begin his cooperation with the DEA, and the DEA began planning a law enforcement operation with the Defendant. Following that interview, in August 2019, the Defendant introduced a DEA confidential source ("CS") to two other drug traffickers. The Defendant coordinated with SA Novick in Spanish to plan and execute that August 2019 law enforcement operation.

Now, over 18 months after his extradition and more than 17 months after receiving notes of his May 2019 interview, the Defendant speculates that SA Novick *may* not have been proficient enough in Spanish to understand him. Notably, the Defendant has never claimed that SAs Novick or Johnson misunderstood him during the May 2019 interview, or that the notes contain any actual misstatements—not in his instant motion, nor the motion he filed last year alleging a *Miranda* violation. *See* ECF No. 58; *see also* Def.'s Mot. to Suppress Statements (ECF No. 30).

The Defendant has not submitted any legal authority to the Court to justify a pretrial hearing on this newly raised and unsubstantiated claim. For the reasons discussed below, the Court should deny his request for a pretrial hearing on the admissibility of his statements at trial.

   a. *Reliability challenges go to the weight, not the admissibility, of the evidence and should be addressed at trial.*

The Court should deny the Defendant's request for a pretrial hearing because his arguments about SA Novick's Spanish proficiency go to the weight, not the admissibility, of SA Novick's testimony about the Defendant's statements. Though he frames it as an argument about admissibility, Defendant's motion challenges the reliability of the Government's proffered evidence. That challenge is appropriate for trial, including through cross-examination of SA Novick, not for a pretrial hearing about admissibility. The Defendant "cites not a single case in which a statement has been suppressed on similar grounds or even that a hearing was held on the issue." *United States v. Larrahondo*, 885 F. Supp. 2d 209, 220 (D.D.C. 2012).

In *Larrahondo*—a case involving the current defense counsel in this case—the defendant requested an evidentiary hearing, alleging that based on the "counsel's interactions with the agent, . . . the DEA agent's Spanish language skills [were] 'questionable'" and that "the government should have recorded" the interview or "utilized a Spanish language translator." *Id.* at 219. The *Larrahondo* Court denied the request for a hearing, noting "the jury, not the judge, traditionally determines the reliability of evidence." *Id.* (citation omitted). The Court added that "relevant evidence is admissible under Federal Rule of Evidence 401 and a defendant may then attack the weight afforded to the evidence, including on reliability grounds, through cross-examination." *Id.* at 220.[1] Similarly, in *United States v. Silva-Arzeta*, the Tenth Circuit noted that allegations about

---

[1] Here, as in *Larrahondo*, the Defendant's statements are relevant and admissible under Federal Rules of Evidence 401 and 801(d)(2)(A).

translation problems are "the bread and butter of litigation," adding: "Although there may be inaccuracies" in the agent's testimony due to "an alleged problem with interpreting Spanish, . . . cross-examination and presentation of contrary evidence (such as [defendant's] own testimony) are what we rely on to assess the truth." 602 F.3d 1208, 1216 (10th Cir. 2010) (noting that "assertions that an officer misinterpreted a defendant's words arise often enough when all participants are speaking English").

The Court should follow *Larrahondo*'s and *Silva-Arzeta*'s lead here.

At trial, SA Novick will testify about his Spanish proficiency before testifying about the Defendant's statements. For instance, SA Novick will testify about his on-the-job Spanish training, including completing a 12-week Spanish immersion course through the U.S. Coast Guard in San Diego in 2015, which was intended to prepare participants to serve as interpreters.[2] SA Novick will also testify that, from 2015 to May 2019, as a law enforcement agent with the U.S. Coast Guard and later with the DEA, he was present or participated in multiple interviews and proffers in Spanish. SA Novick will further testify that the agents clarified any questions they had during the 2019 interview—at times repeating the Defendant's statements back to him—to confirm their understanding and ensure accurate notetaking. This testimony will lay sufficient foundation to introduce Defendant's statements through SA Novick at trial.

Moreover, SA Johnson will also testify that the agents understood the Defendant (and vice versa) in May 2019 and, during the interview, clarified any questions to avoid misunderstandings. As the Ecuador in-country DEA agent since 2016 until at least May 2019—who was later promoted to a supervisory position—SA Johnson was required to have enough Spanish proficiency

---

[2] SA Novick took a Defense Language Proficiency Test practice test after the completion of the course. To the best of his recollection, a score of $1^+/1^+$ was needed to serve as an interpreter on deployment and SA Novick scored higher at $2/1^+$.

to conduct official business with counterparts in Ecuador. SA Johnson will testify that he received about 600 hours of one-on-one training in Spanish over the course of approximately six months before assuming that role. SA Johnson conducted or participated in numerous debriefs in Spanish between 2016 and May 2019, and his testimony will further establish the foundation and reliability of the proffered evidence.[3]

In turn, the Defendant can cross-examine the agents about their Spanish proficiency and/or offer countervailing evidence that the agents were not sufficiently proficient. But there is no need to hold a pretrial hearing about an issue that ultimately goes to weight, not admissibility.

### b. Defendant's claims do not justify a hearing.

Even assuming the Defendant's argument went to admissibility and not weight, which it does not, he still is not entitled to a hearing. "[T]o justify a hearing, the facts presented in the motion must be definite, specific, detailed and nonconjectural." *United States v. Neely*, No. CR 21-642 (JDB), 2023 WL 1778198, at *13 n.7 (D.D.C. Feb. 6, 2023), *aff'd*, 124 F.4th 937 (D.C. Cir. 2024) (collecting cases). For instance, in *Silva-Arzeta*, the defendant "said that he did not recall making various statements" to an agent, and "denied telling" the agent "that he had bought methamphetamine for resale, that he had sold '20s' of the drug, that the cash seized at the apartment was drug-sale proceeds, or that he had bought the gun at a gun show." 602 F.3d at 1213.

---

[3] Moreover, should the Defendant open the door at trial, the Government will proffer additional evidence to rebut any claims of misunderstanding or misstatements. For instance, the Government will proffer evidence that during the 2019 interview, the Defendant and the agents began planning a law enforcement operation to introduce a CS to two other drug traffickers with the Defendant's assistance. And in August 2019, the Defendant met with those two drug traffickers in person to introduce the CS and discuss trafficking routes and 700 kilograms of cocaine. This evidence, among others, will show that SA Novick was sufficiently able to communicate with the Defendant to plan and execute the operation. The Government can also offer testimony about relevant text exchanges from around August 2019 showing the Defendant and SA Novick (and others) communicating in Spanish in a coherent manner.

The Defendant has made no similar assertion here. In fact, the Defendant does not allege *any* misunderstandings or misstatements. He merely asserts that the Court should hold a hearing "at which time the prosecution would be required to produce evidence" of SA Novick's expert "qualif[ication] to translate." *See* ECF No. 58, at 3-4. But the Court need not entertain nor resolve that question because SA Novick is proffered as a fact witness, not an expert. *See Silva-Arzeta*, 602 F.3d at 1216 (noting "the court never had to resolve whether [the agent] had the credentials requisite for an expert because the government did not offer him as an 'expert' witness"); *see also Neely*, 2023 WL 1778198, at *13 n.7 (noting the "court must conduct [an evidentiary] hearing only if evidence on an issue of fact is necessary to the decision of the motion" (citation omitted) (collecting cases)).[4] Moreover, the Defendant's allegation that SA Novick *may* not have been able to understand the Defendant is speculative, conjectural, and contrary to the evidence in this case.

For the foregoing reasons, the Court should deny Defendant's request for an evidentiary hearing, and by extension, his request for the Court to "order the witness to bring" any relevant documents to such a hearing. *See, e.g.*, *United States v. Kasnetz*, No. 3:18-CR-345-L, 2022 WL 847217, at *3 (N.D. Tex. Mar. 22, 2022) ("Hearings on motions to suppress are not discovery proceedings . . . .").[5]

---

[4] Defendant cites to *United States v. Liddell* to argue that "[t]ypically," the Government qualifies its law enforcement witness as "an expert." ECF No. 58, at 3. As noted earlier, SA Novick is proffered as a fact witness, not an expert. Moreover, in *Liddell*, the agent testified both to the facts and the accuracy of translation of phone calls, and the defendant argued that "a jury could easily be confused by the dual role of both fact and expert witness." 64 Fed. Appx. 958, 963 (6th Cir. 2003). The *Liddell* Court therefore cautioned against that approach.

[5] Upon Defendant's first discovery request on January 23, 2026, the prosecutors requested that SA Novick conduct a search for any responsive materials. To date, SA Novick has not identified responsive records in his possession. As stated in a response dated February 6, 2026, should the Government identify responsive records, it will timely produce them.

**B. The Court Should Deny Defendant's Motion to Exclude Government's Drug Expert Testimony (ECF No. 59).**

In August 2025, the Government provided the Defendant with notice that it may offer testimony of three expert witnesses during its case in chief. *See* Notice of Expert Testimony Pursuant to Fed. R. Crim. P. 16(G) (ECF No. 37). That notice remains unchallenged, except for the Defendant's instant motion to preclude certain portions of SA Steve Paris's proffered testimony due to irrelevance and insufficient notice.[6] *See* ECF No. 59. As detailed below, the Court should deny the motion because the testimony is relevant and highly probative, and to the extent the Government's initial disclosure provided insufficient notice, the Government's supplemental disclosure, filed contemporaneously with this response today, cures any such insufficiency.

    *a. SA Paris's anticipated expert testimony is relevant, helpful, and highly probative.*

Under Federal Rule of Evidence 702, expert testimony is admissible when, in relevant part, it will "help the trier of fact to understand the evidence or to determine a fact in issue." SA Paris's testimony meets that standard.

In its notice, the Government disclosed that SA Paris would testify about the methods of trafficking cocaine from South and Central America to Mexico; the origins, prices, and well-known suppliers of cocaine; and the roles, operations, and trafficking routes of Mexican drug cartels, including *Cartel de Jalisco Nueva Generacion* ("CJNG"), such as drug cartels' use of tunnels at important points of entry into the United States. ECF No. 37, at 4. The Government's disclosure also noted that SA Paris will testify about how cocaine looks and smells, as well as how

---

[6] Though the Defendant does not challenge SA Paris's testimony about cocaine prices at places and times relevant to the conspiracy, SA Paris's testimony about prices will provide an insight into the Defendant's own negotiations in the recordings. Cocaine prices are not within the knowledge base of the average jurors.

it is manufactured and packaged.[7] *Id.* Lastly, the Government disclosed that SA Paris may opine on certain coded words or exchanges in the recordings in this case. *Id.* Testimony on these subjects is not only relevant but also helpful for the jurors to understand the evidence and determine facts in issue.

For instance, in a recorded conversation on January 28, 2018, the Defendant stated that "[w]e have a problem," because "[t]hey put a bomb in San Lorenzo," but that "everything [was] still on, we just have to be more careful. . . . We have to be . . . very careful."[8] *See* Consol. Mem. in Support of the Gov't's Mots. in Limine (ECF No. 32-1) 10 n.3. SA Paris will testify that "FARC," a guerrilla group, has significant cocaine operations in the San Lorenzo border area between Colombia and Ecuador and supplies significant quantities of cocaine to Mexican drug cartels for importation into the United States. The average juror may not know that "FARC" controls the San Lorenzo border area, nor its scale of cocaine operations there or its role in the drug trafficking activities of Mexican drug cartels. Therefore, SA Paris's testimony will help the jurors understand why the Defendant was concerned about a bombing in San Lorenzo in January 2018 and why he was advising the CS that "everything [was] still on" but that they had to be "very careful," as captured in recordings. *Id.* SA Paris's testimony thus can help the jurors determine key facts in issue, such as Defendant's consciousness of guilt and his expectation of a cocaine shipment despite the bombing.

As another example, SA Paris will testify that the Port of Manzanillo—a shipment destination the Defendant and his co-conspirator discussed in the 2018 recordings—is in the State of Jalisco in Mexico, which is the CJNG's base of operations, and that the CJNG controlled the

---

[7] The Government agrees to not elicit testimony about how cocaine affects the body.

[8] "FARC" stands for *Fuerzas Armadas Revolucionarias de Colombia*, or the Revolutionary Armed Forces of Colombia.

port and used it to receive cocaine shipments. While some jurors may know where the Port of Manzanillo is, they cannot be expected to know that the CJNG controlled that port or that the CJNG used that port to receive large shipments of cocaine hidden in cargo ship containers. SA Paris will testify that the significant majority of drug shipments sent to Mexico, including to the CJNG and the Port of Manzanillo, are destined for the United States. This testimony is helpful for the jurors to determine whether the Defendant—who admitted to working with CJNG members to send cocaine shipments to Mexico—had reasonable cause to believe that the cocaine was destined for the United States. SA Paris's testimony on this topic and on coded language used in the recordings, *see infra* p. 10, will also help the jurors determine why the Defendant was discussing in the recordings the number of days it would take "it" to reach the U.S.-Mexico border and that "they c[ould] handle 200 kilos daily." *See id.* at 2.

Moreover, SA Paris's testimony about how cocaine is manufactured, packed, and labeled will help the jurors understand Defendant's discussions in the recordings. Specifically, SA Paris may testify that powder cocaine is compressed into kilogram quantities and rectangular/brick shapes and wrapped in a combination of rubber or plastic (or both). He may also explain that cocaine bricks often have imprints on them or labels on their packaging materials, such as imprints or labels of luxury brands like *Rolex* or *Giovani* for marketing purposes. This testimony in turn will help the jurors understand why the Defendant refers to *Giovani* in the recordings.

Moreover, SA Paris will opine, based on his specialized knowledge, on the coded meaning of certain words and exchanges in the recordings. For instance, in February 2018 recordings, the Defendant stated that he would ask his co-conspirators whether they "want[ed] it *dry*, or . . . *wet*?" SA Paris will testify that "dry" and "wet" are common codewords among drug traffickers to refer to either 1) land and sea drug shipment methods, respectively, or 2) powder and liquid forms of

cocaine, respectively. SA Paris may also explain that vague words like "it" are often used to refer to drug loads. Average jurors would not know such coded meanings.

In short, SA Paris's testimony is relevant and will help the jurors understand the evidence and determine facts in issue in this case. Fed. R. Evid. 401, 702(a). His testimony is also highly probative of key facts in dispute, including Defendant's knowledge of drug trafficking operations, as well as his intent and ability to commit the charged crime, though "the relevance of the government's proffered expert evidence is not dependent on the defendant['s] decision whether to dispute any particular element of the charged offense." *United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 212 (D.D.C. 2015), *aff'd*, 902 F.3d 285 (D.C. Cir. 2018). Moreover, the Defendant has not offered any risk of unfair prejudice, let alone to a degree that substantially outweighs the highly probative testimony of SA Paris. Nor could he, because the proffered evidence is not more inflammatory than the charged crime. *See, e.g.*, *United States v. Fitzsimons*, 605 F. Supp. 3d 92, 101 (D.D.C. 2022) ("Unfair prejudice as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial . . . . The prejudice must be unfair." (citing *United States v. Cassell*, 292 F.3d 788, 796 (D.C. Cir. 2002))); *Mosquera-Murillo*, 153 F. Supp. 3d at 212 (noting that "probative value" of expert testimony about "operation of Colombian" drug trafficking organizations "substantially outweigh[ed] any risk of unfair prejudice"); *United States v. Herron*, No. 10-CR-0615 NGG, 2014 WL 1894313, at *5 (E.D.N.Y. May 12, 2014) (noting "evidence is not unduly prejudicial when it is not 'more inflammatory than the charged crime[s]'" (citation omitted)). Accordingly, SA Paris's testimony is admissible expert testimony, and the Court should deny the Defendant's motion to exclude it.[9]

---

[9] The Government does not intend to elicit testimony about "el Mencho." *See* ECF No. 59, at 5 n.1. Regardless, the recent killing of the CJNG leader does not give the Defendant immunity against the proffered CJNG-related testimony. Moreover, he was not just associating with "unsavory" individuals; he worked with them to commit the charged crime. Therefore, any

*b.  The supplemental disclosure provides sufficient notice.*

The Defendant argues in the alternative that, even if SA Paris's testimony is admissible expert testimony, the Court should exclude it because the Government's initial expert disclosure was insufficient. To the extent the Government's initial disclosure was insufficient, however, the Government has cured any deficiency through a supplemental expert disclosure filed contemporaneously with this response.

Together, the Government's initial and supplemental expert disclosures provide ample detail about SA Paris's expert testimony, and both of those disclosures are timely. Federal Rule of Criminal Procedure 16(a)(1)(G)(ii) provides that the time of expert disclosure "must be sufficiently before trial to provide a fair opportunity for the defendant to meet the government's evidence." In *United States v. Martinez*, the D.C. Circuit upheld the admission of expert testimony where the Government supplemented its expert notice approximately six weeks before trial, even though the Government supplemented its notice in its opposition to the defendant's motion to exclude the testimony. 476 F.3d 961, 967 (D.C. Cir. 2007). The *Martinez* Court concluded that disclosure was sufficiently before trial. *Id.* (noting such expert testimony is "common in drug cases"); *compare with United States v. Day*, 524 F.3d 1361, 1372 (D.C. Cir. 2008) (affirming exclusion of testimony where expert opinion was disclosed "less than a week before trial" during a pretrial hearing); *see also* Mem. & Ord. at 4, *United States v. Ruben Oseguera Gonzalez* (D.D.C. Aug. 15, 2024) (No.

---

prejudice from such evidence is not "unfair," let alone unfair enough to "substantially" outweigh the highly probative testimony at issue. *See, e.g.*, *Mosquera-Murillo*, 153 F. Supp. 3d at 212 (emphasizing the "probative value" of expert testimony about drug trafficking organizations' operations).

16-229) (admitting expert testimony about drug organizations' operations and coded communications where supplemental notice was filed seven weeks before trial).

Here, the Government supplemented its initial disclosure over seven weeks before trial, which provides sufficient information and notice for the Defendant to meet the Government's evidence, including by briefing and arguing any remaining objections before the motions hearing and pretrial conference on April 17 and 24, 2026, respectively. For this reason, too, the Court should deny the Defendant's motion to exclude the Government's drug expert testimony. *See Mosquera-Murillo*, 153 F. Supp. 3d, at 209 (noting district courts' broad discretion to admit or exclude expert testimony).

### C. **The Court Should Deny Defendant's Motion for Pre-Trial Determination of Admissibility of Conversations Recorded by a Non-Testifying Informant (ECF No. 60).**

In its motion in limine to admit recordings of the Defendant, the Government detailed evidence and case law sufficient "to support a finding that" the recordings are what the Government claims them to be: recordings of meetings, calls, and voice memoranda of the Defendant during and in furtherance of the charged conspiracy. Fed. R. Evid. 901(a); ECF No. 32-1, at 5-11. The Defendant does not dispute that he is among the individuals being recorded nor that the statements captured in the recordings are admissible non-hearsay. He also does not dispute that the content of the recordings is consistent with his statements to DEA agents in May 2019. Instead, the Defendant argues that the recordings should be excluded because they cannot be authenticated due to alleged chain-of-custody issues, noting the recordings may not be "complete" or in the "same condition" as "when they were made." ECF No. 60, at 4. He states, for example, that the CS had a motive to manipulate the recordings. *Id.* Given the Government's proffered evidence to authenticate the recordings, however, any claims about alleged chain-of-custody issues go to the weight, not the admissibility of the recordings. Thus, the Court should deny the Defendant's

request for a pretrial hearing on the admissibility of the recordings.

Federal Rule of Evidence 901(a) requires the proponent of an item of evidence at trial to "produce evidence sufficient to support a finding that the item is what the proponent claims it is." For recordings, this can be done in two ways: (1) a chain of custody demonstrating the recordings are in the same condition as when they were recorded, or (2) testimony demonstrating the accuracy and trustworthiness of the tapes. *United States v. Collins*, 715 F.3d 1032, 1034 (7th Cir. 2013); *United States v. Thomas*, 294 F.3d 899, 904-05 (7th Cir. 2002) (noting preliminary admissibility questions "must be established by a preponderance of proof" for either method). The "threshold for the Court's determination of authenticity is not high." *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (describing the Government's initial burden for authentication as "slight").

In *Collins*, for example, a case involving a "large drug-distribution conspiracy" with recordings made abroad (as here), the Seventh Circuit upheld the admission of the recordings after concluding that the Government had satisfied both methods of authentication. *Collins*, 715 F.3d at 1034. There, DEA agents instructed a CS based in Mexico to "record his telephone conversations" with drug suppliers and buyers. *Id.* The CS did so and "provided the government with numerous tape recordings." *Id.* The DEA agents testified to their communications with and instructions to the CS. *Id.* at 1035. The agents also testified that "upon receiving the tapes, they labeled them, copied them, and downloaded their contents," and that the "tapes never left the government's possession" after receipt. *Id.* The Seventh Circuit deemed this testimony sufficient to authenticate the tapes through the chain-of-custody method—even though each "recording was made outside the presence of government agents" and despite the CS not testifying. The Court explained further:

> [M]erely raising the possibility of tampering is not sufficient to render evidence inadmissible. . . . We think the government's procedures in obtaining the tape

13

recordings and preserving their accuracy were reasonable in light of the circumstances . . . . [I]t would be an impossible standard to always require agents to be present when a tape recording is made, especially in foreign countries. . . . Any possible, however hypothetical, gap in the chain of custody goes to the weight of the evidence, not its admissibility.

*Id.* at 1035-36 (citation omitted) (collecting cases). The *Collins* Court also held that the Government had provided ample circumstantial evidence to "satisf[y] its burden" under the second method of authentication, i.e., demonstrating the accuracy and trustworthiness of the tapes. There, the Government offered "voice identification" and other evidence, namely cellphone records, which "coincided with" the tapes. *Id.* at 1036.

Like in *Collins*, the Government can satisfy both methods of authentication in this case. First, SA Novick's testimony adequately establishes the chain of custody for the recordings here. For instance, SA Novick will testify that he recruited the CS and had regular (at times daily) check-ins with the CS. SA Novick will explain that he instructed the CS to record conversations with the Defendant and others, as circumstances safely permitted, and to provide those recordings on a rolling basis as soon as practicably possible. SA Novick also instructed the CS on how to use the recording application on the CS's cellphone. The CS, in turn, recorded his conversations with the Defendant and others. During their regular check-ins, SA Novick and the CS would often discuss an upcoming event, such as a call or a meeting and the expected participants, and then the CS would provide the corresponding recordings capturing the same participants to SA Novick shortly after the event. SA Novick received the recordings electronically directly from the CS. At least once, SA Novick was present when the CS placed a recorded call to the Defendant.[10] Moreover, at a later meeting, SA Novick received several recordings from the CS in person and was able to

---

[10] In its prior filing, the Government stated that the CS recorded that call in SA Novick's presence and later provided the recording to SA Novick. *See* ECF No. 32-1, at 7. The Government hereby corrects that representation: SA Novick himself recorded that call in the presence of the CS; the CS did not record the call.

observe the CS send those recordings over WhatsApp. Upon receipt, SA Novick saved and dated each recording to reflect the date of the underlying event and maintained custody of the recordings in evidence. The recordings at issue never left the Government's possession. This testimony offers enough evidence to authenticate the recordings under the chain-of-custody method.

As for the second method of authentication, SA Novick will supplement the above evidence in two important ways. First, SA Novick had direct (face-to-face and over-the-phone) communications with both the Defendant and CS, and thus he can and will identify both of their voices. Second, as discussed earlier, SA Novick will also testify about Defendant's admissions in May 2019, and those admissions overlap in significant ways with the statements the Defendant made in the recordings. *See* ECF No. 32-1, at 8-9. For instance, recordings from February and early March 2018 capture the Defendant discussing with the CS a "job" to send a 600-kilogram shipment to Mexico from Ecuador with "Chiquitin" and others. In May 2019, the Defendant admitted that around February 2018, he worked with the same individuals to send a load of about 500 to 600 kilograms of cocaine from Ecuador to Mexico. *See id.* (additional examples of overlaps between the recordings and Defendant's later admissions). Such overlaps—which the Defendant has not disputed in his filings—are notable because they undermine Defendant's argument that the recordings may have been altered or manipulated by the CS. *See* Def. Responses & Opposition to the Gov't's Mot. in Limine (ECF No. 36); *see also* ECF No. 60. Taken together or apart, this additional testimony is "ample circumstantial evidence supporting the [recordings'] accuracy and trustworthiness." *Collins*, 715 F.3d at 1036; ECF No. 32-1, at 7-8.

In short, the proffered evidence here meets the Government's "slight" burden and authenticates the recordings by showing that the recordings are what they are claimed to be. *Hassanshahi*, 195 F. Supp. 3d at 48; ECF No. 32-1, at 6-9; Fed. R. Evid. 901(b)(1), (4), and (5).

The Defendant's alleged flaws "go to the weight of the evidence instead of its admissibility." *Hassanshahi*, 195 F. Supp. 3d at 48. Accordingly, the Court should deny the Defendant's request for a pretrial evidentiary hearing on the admissibility of the recordings and leave "the ultimate resolution of the evidence's authenticity . . . for the jury." *Id.*

### D.  **The Court Should Deny Defendant's Motion to Compel (ECF No. 61).**

Following the Defendant's decision to change his counsel again in January 2026, the Government reproduced to the current defense counsel all materials and information produced to the Defendant's prior counsel. In addition, the Government produced a number of its exchanges with the prior counsel and the Court's chambers, in an effort to assist the new counsel in their preparations. Upon his renewed discovery request for all communications with prior counsel— unlimited by date or topic—the Government asked the Defendant to provide the legal basis for his broad request. The Defendant provided none.

The Defendant now moves the Court to compel the production of all communications between the Government and the Defendant's prior counsel. He argues that the communications are discoverable under Federal Rule of Criminal Procedure 16 because they are "material to the defense" and items "obtained from or belong[ing] to the Defendant," but again he does not provide a single case that supports his request. The Court should deny the Defendant's motion to compel.

First, the communications the Defendant seeks are not "material to the defense." Evidence is material if "there is a strong indication that it will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal.'" *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (citation omitted). To show "materiality," the defendant "must demonstrate that the requested evidence 'bears some abstract *logical relationship to the issues* in the case. There must be some indication

16

that the pretrial disclosure of the disputed evidence would [enable] the defendant *significantly to alter the quantum of proof* in his favor.'" *Id.* (emphasis added) (citation omitted).

The Defendant cannot make that showing here. The Government has already reproduced material discovery to Defendant's current counsel. And the Defendant's prior counsel did not disclose material information or evidence to the Government, either through communications or otherwise. The Government's communications with prior defense counsel, on their own, do not themselves have a "logical relationship to the issues" in this case, nor are they capable of "alter[ing] the quantum of proof in [Defendant's] favor."[11] *Id.* Defendant's materiality argument is therefore meritless.

Second, the Government's communications with the Defendant's prior counsel were not obtained from the Defendant, and so they are not discoverable under Rule 16 on this basis, too. The Defendant is "unable to postulate any principled reason" to put the burden of compiling all those communications, which are not discoverable, on the Government, as opposed to an order directed at his prior counsel. *See* ECF No. 61, at 2 (complaining that the Government has not "postulate[d] any principled reason" for producing some of prior counsel's communications with the Government but not all). Indeed, the Defendant acknowledged in his motion that he has "recently" requested the "entirety of the Defendant's file" from his prior counsel. That the Government produced, as a good faith gesture, its communications with prior counsel about the most recent plea offer[12] and communications between the parties and this Court's chambers about pretrial filings (including filings not available on PACER) to further assist the defense counsel in

---

[11] The current defense counsel has previously insinuated that the prior counsel may be receiving a civil complaint soon. The Defendant's discovery request may be material and appropriate in that civil case, not here, and should be directed to the prior counsel in any case.

[12] The Defendant rejected that plea offer last year. The Government has not extended another offer since.

their preparations does not create a broad and burdensome discovery obligation where one does not exist.

Because Rule 16 does not require the Government to produce the communications the Defendant seeks, the Court should deny the Defendant's motion to compel.

### E.   The Court Should Deny Defendant's Motion to Strike Improper Alias (ECF No. 62).

The Defendant asks the Court to strike the Defendant's alias from the indictment and preclude the Government from mentioning the alias during its case in chief. The Government does not intend to present testimony about Defendant's alias in its case in chief, so the Defendant's motion is moot as to that request. As to his request to strike the alias from the indictment, unless the Court prefers to "provide the indictment to the jury" or "read it to them," there is "no risk of prejudice to the defendant from the inclusion of any aliases on the indictment." *Larrahondo*, 885 F. Supp. 2d at 219 (noting that as a matter of practice, the court did not "provide the indictment to the jury at trial," or "read it to them"). Should the Court's practice be to provide or read the indictment to the jury, the Government does not oppose striking the alias.

### F.   The Court Should Deny Defendant's Motion to Quash Subpoena Results (ECF No. 63).

The Defendant moves to "quash" the results of a subpoena the Government issued to obtain the Defendant's recorded communications while incarcerated at the Alexandria Detention Center. He asks the Court to (1) order the Government to "return" the materials to the Alexandria Detention Center, who produced the requested information, presumably as a sort of suppression remedy to ensure the materials are not used at trial; and (2) determine whether the Government has made any

improper derivative use of the information that it obtained by requiring it to disclose who reviewed any of the materials. The Court should deny this motion.

As an initial matter, before the Defendant even filed his motion, the Government informed the Defendant that it did not intend to use any of the information received in response to the subpoena at trial. After the Defendant's motion, the Government realized that, and now acknowledges, it sent what it intended to be a grand jury subpoena to the detention center using a trial subpoena form. This technical and unintended defect should not be deemed a fatal flaw. At the time the subpoena was issued, the Government had an active grand jury investigation against the Defendant for uncharged acts and intended to use a grand jury subpoena to obtain the results at issue here, and the detention center complied with that subpoena to produce the requested information.[13] Regardless, the Government does not intend to use the subpoena results at trial and so any request to return the subpoena results as a suppression remedy for using a trial subpoena form, rather than a grand jury subpoena form, is moot.

Moreover, the Government has not made any "improper derivative use" of the subpoena results and has made every effort to ensure the results were not used for an improper purpose. *See* ECF No. 63, at 1-2. Although the subpoena emphasized that it requested only non-privileged communications, after the detention center produced the requested communications, a Government paralegal prepared a document summarizing the Defendant's calls. The undersigned counsel identified a potentially privileged communication in that summary document, at which point she paused her review of that summary document and engaged a filter team to ensure no potentially privileged communication was accessible to the prosecution team. The Government

---

[13] Should the Court request information about the Government's grand jury investigation, the Government will provide that information in an *ex parte* submission.

also engaged the Chief of the Privilege Review and Litigation Unit ("PRLU") at the Money Laundering, Narcotics and Forfeiture Section for his professional recommendation on any reassignments. The PRLU Chief recommended that the Government reassign the case paralegal, who had reviewed and summarized some of the Defendant's calls; the paralegal was accordingly reassigned to the filter team. The PRLU Chief further determined that the rest of the prosecution team could remain assigned to the case. The remaining prosecution team, including case agents, have not otherwise accessed or reviewed the subpoena results or discussed the privileged contents of the results with the paralegal who reviewed them, nor have any Government witnesses. Therefore, the Government has not made any derivative use, improper or otherwise, of the subpoena results.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motions.

Dated: March 16, 2026

Respectfully submitted,

MARGARET A. MOESER, Chief
Money Laundering, Narcotics and
Forfeiture Section
Criminal Division
U.S. Department of Justice


 /s/   Lernik Begian
Lernik Begian
James Hepburn
Trial Attorneys
Money Laundering, Narcotics and
Forfeiture Section
Criminal Division
U.S. Department of Justice
lernik.begian@usdoj.gov
james.hepburn2@usdoj.gov

20

**Certificate of Service**

I hereby certify that a copy of the foregoing was sent via ECF to counsel of record, this

16th day of March 2026.


By: _/s/ Lernik Begian_
     Lernik Begian
     Trial Attorney
     Money Laundering, Narcotics
     and Forfeiture Section
     Criminal Division
     U.S. Department of Justice